We're ready for argument now in the case of Wertmeyer v. Walmart. Mr. Norgaard. Thank you, Your Honor. And may it please the Court, my name is Matthew Norgaard and I represent the appellant, Plaintiff Wertymer, in this matter. Here, fraud is prevalent within the honey industry because costs can be cut by producers by heating and processing honey to make it easier to bottle while still charging consumers premium prices by passing the honey off as raw. Here, Plaintiff asks this Court to reverse the District Court's dismissal of Plaintiff's first amended complaint because the allegations, when taking every reasonable inference in favor of Plaintiff's support, at first, reasonable consumers expect that raw honey is unheated and minimally processed. Mr. Norgaard, I'm going to start you right off, please. In the Greer case in the Sixth Circuit, you argued that industry standards dictate raw honey must have an HMF value below 40 mg kg. But here you say it is an accepted fact that the limit is 10, not 40. What are we supposed to make of inconsistent factual allegations in two cases? Your Honor, that goes to the second issue I was going to address, whether Wal-Mart's labels violated consumers' expectations. And here, Plaintiff's arguments are consistent with their arguments in the Greer case. In paragraphs 29 and 31 through 35, Plaintiff's alleged, as they have consistently alleged, that the Codex is an industry standard, widely accepted, that sets a limit for all honey directly sold to consumers of 40 mg per kg. Both raw and filtered honey are sold directly to consumers. Thus, compliance with the Codex— You're not addressing Judge Rovner's question, which is also mine. How is it that you're telling the Sixth Circuit that a score of 40 is the dividing line, and you're telling us that a score of 10 is the dividing line? Both of these things cannot be true at the same time. Your Honor, in both courts, we allege that the Codex for all honey was 40. Thus, honey above 40, which was the case in that instance, is not raw. Plaintiff also cites— I take it that Walmart's honey had a lower score, right? What comes across is these allegations or these assertions seem to be tailored not to some underlying standard, but to your perceptions of what the facts will show. And that can't be right. Your Honor, I don't believe we tailored them to the facts. I believe we cited sources to support our allegations. As I said, the Codex was a limit for all honey. The plaintiff cites additional sources in paragraphs 27, 28— You're just not dealing with the inconsistency problem. I believe— I expected you to file a prompt response to the other side's charge that you were being, well, it looks like egregiously inconsistent. There was no response then, and I'm not hearing a response now. Your Honor, if I may, I believe I am responding. In that court, the honey azimuth levels tested beyond 40. The Codex sets a limit for all honey sold directly to consumers, whether filtered or raw, of 40. Plaintiffs allege that the filtered honey in this case complied with that standard. It was sold to consumers. It was below 40 because it tested at 39 milligrams per kilogram. I still am not understanding. I really am not. Which is it? Is it 40 or is it 10? Which is this accepted fact? Raw honey typically has an HMF value that is absent in the single digits or less than 10 milligrams per kilogram. Plaintiffs cited three separate sources for this fact. Plaintiffs, also to distinguish because the Walmart's honey tested above the 10 was within the Codex limit for all honey sold directly to consumers, to distinguish between the filtered and raw honey, cited the additional sources for the proposition that raw honey is typically absent from HMF values. What are the valuable enzymes that Wertmeier alleges are missing from the raw honey? Your reply brief states that filtration or heating causes honey to lose certain qualities. Is that sufficient to state a claim? I mean, don't we need to know what those certain qualities are that people want? To sustain a claim, we need to know what reasonable consumers expect when they encounter a term on a label, here the term raw honey, and what consumers expect is the honey to be unheated and minimally processed so that it retains those perceived qualities. Plaintiffs draws on definitions by the USDA, the National Honey Board, articles that discuss consumers' views of its interpretation of raw honey and health digest and health wine. Look, your complaint, help me please, your complaint says in essence, people want raw honey and this is not raw honey, but it fails for me at any rate to tell us what people want from raw honey, what they think raw honey is, what Walmart was giving them instead. So, please, what do people want when they buy raw honey and how do they or we know they're not getting it? Thank you, Your Honor. In paragraphs 9, 12, 13, and 21, plaintiffs allege that consumers expect raw honey to be unheated and minimally processed so that it retains those perceived benefits. Plaintiffs support that interpretation by drawing on those various sources I previously described. Plaintiffs demonstrated that Walmart violated those expectations by citing to the laboratory tests that showed that they violated the standard. Where are the well-pleaded allegations that demonstrate that the HMF testing definitively showed that this honey was not in fact raw? Plaintiff cited in paragraphs 27, 28, and 30, a peer-reviewed open source chemistry journal, a self-described leading European food and laboratory testing facility, as well as a New Zealand honey producer for the prospect that raw honey typically has an HMF value that is absent in the single digits or less than 10. The codex, which sets a standard for all honey directly sold to consumers, whether filtered or raw, both are sold directly to consumers, sets a limit of 40. Just because you comply with the codex does not mean that you have raw honey. It means that you can sell your honey directly to consumers. Label it correctly, though, filtered or raw. Here, the test showed that the HMF value was 22 milligrams per kilogram, which is 124 milligrams higher than the limit in those sources cited by plaintiff in paragraphs 27, 28, and 30. Further, there are two bottles of honey tested in this case. The first bottle, which showed heating, and the second bottle, which demonstrated the mannose level, violated consumer expectations because it was industrial processed. Do we take into consideration that the honey that was sent to the lab was sent 10 months after its purchase? Your Honor, to the extent that the appellant asserts that any HMF value was to the storage, that's a question of weighting the evidence, and plaintiffs should be afforded the chance to have an expert witness develop that testimony and testify to what exactly contributed to the HMF value, whether that was storage, heating, in this instance. Further, the storage would have no effect on the mannose value, which in here indicated industrial processing. The test eliminated the— Don't you have to meet the heightened pleading standard of Rule 9? I believe in this instance we do. We allege that the plaintiff purchased it in June from a specific Walmart store in Illinois. The label stated that it was organic raw honey, and the plaintiff cited laboratory testing that demonstrated how that label did not conform to those expectations. Those, I believe, meet— That's enough for fraud. I believe that's enough for the ICFA. For the fraud to show fraudulent— Enough for what? Under the ICFA, the Illinois Consumer Fraud Act. I'm sorry for using the acronym, Your Honor. Real words help. Under the Common Law Fraud Claim, plaintiff brings the size of Walmart, the fact that it's more economical to bottle heated than processed honey, that consumers cannot tell the difference between processed or filtered honey and raw honey in the store, and the potential to charge premium prices, and the fact that Walmart did charge those premium prices, should be enough to infer, just as in the Convy-Walmart case, or in Kraft Food v. Sun-Octa ingredients, that Walmart knew its honey did not meet that standard. Has the Federal Trade Commission or the Department of Agriculture ever set definitions of raw honey? The USDA has never set and adopted a specific standard for raw honey, but has— On the Federal Trade Commission. I don't believe so, Your Honor. It didn't come up in our research. The National Honey Board, an instrumentality of the USDA— The National Honey Board appears to be a trade association. How is it that trade associations get legal authority to set standards? They're an instrumentality of the USDA, and plaintiffs— They're an instrumentality of what? The United States Department of Agriculture. But you've already told me that the Department of Agriculture hasn't set a definition. They have a description of raw honey that complies with the plaintiff's definition of raw honey, that it's honey as it exists from the beehive, but not filtered. Plaintiff cites numerous sources for the contention that filtered honey, that term, when used in the context of raw honey, means heated and unfiltered, or unprocessed. Your Honors, if there are no further questions at this time, I would like to— I have a quick one. Is there evidence that Mr. Wertmeier actually bought and paid for the honey, like a receipt? I don't believe one was attached to the complaint. It was alleged in the complaint that he purchased it from the store. At that point, I believe the allegation would be enough to survive a motion to dismiss, and upon summary judgment, if Plaintiff Wertmeier did not produce a receipt, that could be something that potentially Walmart could challenge. But if there are no further questions, I would like to remain— Yeah, you don't know the answer. How do we tell whether this National Honey Board is part of the Department of Agriculture? Its website has a dot-com address, not a dot-gov address. They're described as an instrumentality of the USDA. What does that mean? If I look in the United States Code or the Code of Federal Regulations, what reference do I find to the National Honey Board? I wouldn't know, Your Honor. I was— You wouldn't know? The complaint reflected— You told us it was part of the Department of Agriculture. I said it was an instrumentality of the United States Department of Agriculture. But you don't know what the word instrumentality means? Not in this instance, Your Honor. I don't know what legal authority they have. So far as I can tell, absolutely none. Your Honor, we cite that as an example that our definition comports with the industry definition and that consumers' definition is— and that's precisely what happens in Fleming v. Dr. Squatch LLC. The plaintiffs drew on the USDA guidance, even though it wasn't adopted by a regulatory agency, to support their definition of what a reasonable consumer understood. I don't see how you can tell a court that something is an instrumentality of the Department of Agriculture and then say you have no idea what the word instrumentality means and no way of showing that your statement is true. Your Honor— This is a serious problem. I expect representations by counsel to be absolutely truthful. I'm sorry. That is how it's described on their website. And in anything that we've checked, they've described themselves as an instrumentality of the USDA. I'm sorry that I can't tell you exactly what that means. But they do describe themselves on their websites. Have you looked in any statute or any regulation to see what relation they have to the Department of Agriculture? No, Your Honor, because, you know, we didn't think— we weren't relying on them solely for this definition. It was also the USDA's own description, which is—matches the national honey boards. All right. Thank you, Mr. Norgard. Mr. Northrup. Good morning, Your Honor. Do you know what the National Honey Board is? I think it's as you described it. It's a trade association. I don't know their exact affiliation with the Department of Agriculture. If they do, I think it's just a trade association. I don't expect government agencies to have dot com web addresses, among other things. Your Honors, my name is William Northrup. I'm here on behalf of Walmart. There is a great deal that is wrong with plaintiff's complaint in this case, and it builds on each other. Any of these problems is fatal and warrants affirmance of the district court. I do want to start with the standard. Judge Easterberg, earlier this morning, you made a comment that contracts are objectives and you can quote the language of a contract. Standards are objectives, too. You can quote the language of the standard. There are few things simpler or easier to accomplish in federal court practice than pleading a standard. You quote the standard. You cite the body that put the standard out. You can either put a link to the standard or you can attach the standard to your complaint. That's how you do it. Plaintiff's counsel in this case know how to cite standards. They cited the United States Department of Agriculture's definition for raw honey, which says nothing about Mannose values. It says nothing about HMF values. They cited the Codex standard. They've cited the Codex standard in multiple courts. Your Honor's discussed the Sixth Circuit. In the Pope v. Kroger case in the Southern District of Ohio, plaintiff's counsel in this case signed a complaint that said the international standard requires that raw honey must have a maximum HMF value of 40 milligrams per kilogram to ensure the product has not undergone extensive heating. In the Pierce v. North Dallas honey case in the Northern District of Texas, plaintiff's counsel signed a complaint saying the Codex is the international reference standard and has set a maximum level for raw honey at 40 milligrams per kilogram. In the Wingate v. Barkman honey case, which was in the Northern District of Kansas, plaintiff's counsel signed a complaint that stated the generally understood definition of raw is an HMF value of 40 or less. Here, they took the honey that their client purchased from Walmart. They sent it to their testing company, 10 months after it was purchased, and the report came back from their testing company, and it said HMF standard passed 20 milligrams per kilogram. At that point, they could have called up their client and said, hey, we've got some bad news. That raw honey you bought at Walmart was actually raw. Instead, what they did was they looked to find a new standard, and they haven't pled it here with particularity. They haven't cited anybody. They haven't cited any testing organization that says 10 milligrams per kilogram is what you have to have on an HMF value when you sell raw honey to a consumer. I think that when you sell raw honey to a consumer is an important point. In the Greer case, the Sixth Circuit explained, and I quote, a jar of honey is a single discrete product purchased on a particular date. That jar of honey, on the date it is purchased, either complies with the claims of the label or it does not. So when you're looking at whether this honey was raw, whether the HMF value met the standards that exist, you're looking at that date of purchase. And that's important because every single source that plaintiff cites in their complaint to talk about HMF value explains that HMF value is not merely a measure of heating. It is also a measure of freshness. Plaintiff's counsel in his argument pointed to paragraph 28 of his complaint and said it cited a peer review studied. What paragraph 28 says is heating increases the HMF value. That's all bolded. And then there's a quote. Nevertheless, although HMF occurs at very low concentrations and can even be absent in both fresh honey and food products, heat treatment and or prolonged storage conditions can enhance further HMF production. Plaintiff's also talked about their New Zealand source, airborne honey. And when looking for this standard, it's really impressive the work that plaintiff's counsel put into this because they really did kind of scour the internet to look for any support to support their new standard. They cited a company called Big Island Bees, which is a small beekeeper that specializes in raw honey on the Big Island of Hawaii. They cited a company called Apaterra, which is a company in Brooklyn, New York, that imports honey from Eastern Europe and specializes in raw Eastern European honey. They cited a company called Balquise, which is a Yemeni beekeeper that doesn't sell any honey outside of the Middle East other than at a location in Heathrow Airport in London. No locations in the United States. And then they cited this company called Airborne Honey in New Zealand, which Airborne Honey is the one that they're citing for their key points, which is paragraph 30 of their complaint. Airborne Honey is a small beekeeper in New Zealand that specializes in raw honey, that uses HMF value to market their raw honey and to differentiate it on the marketplace. And they, at the time of the complaint, did not ship honey outside of New Zealand. It does look now like on their website that you can buy Airborne Honey, if you like, outside of New Zealand. But at the time of the complaint, there's no indication that any American consumer would ever have been aware of this website. But they cited on paragraph 30, and they have in big, bold letters, HMF levels higher than 10 milligrams per kilogram demonstrate heating. And they follow that with a quote from the Airborne Honey website, which says, it is usual for HMF to be below 10 milligrams per kilograms in fresh extracted honey. Levels higher than this may indicate excessive heating during the extraction process. So what they're talking about here is the HMF value you get when you're standing at the hive and you cut a segment out of the hive and you put it in a spinner and you centrifuge it to get the honey out. They're talking about truly fresh extracted honey. They're not talking about what you buy at Walmart. When you buy raw honey at Walmart, you aren't taken into a back room where there's a beehive and have a segment cut out. You're buying a product that is sitting on a shelf, that's in a bottle. The photos of the bottles are actually attached to the complaint and they're in the record. If you want to look at them, the district court did because they actually are kind of revealing about what was in the honey. And what Airborne Honey goes on to say on the website, which is not quoted by plaintiff, is that once the honey is extracted, the HMF value immediately starts to increase. And they say, the hydromethyl for floral content of honey after processing or blending shall be no more than 40 milligrams per kilogram. However, in the case of honey of declared origins from countries regions with tropical ambient temperatures and blends of these honey, the HMF content shall be no more than 80 milligrams per kilogram. That's a quote from the codex. It's quoted there on the HMF. And it's important for two things. Plaintiffs have made a big deal about honey having properties for which it is prized, whatever that means, or enzymes or other special things that are prized by consumers of raw honey. The codex sets two standards, 40 milligrams per kilograms and 80 milligrams per kilograms. The difference for the two standards is HMF value can increase at natural temperatures. And so if you buy honey that is made in the tropics, such as from Brazil, such as from Hawaii, the temperatures in the hive can actually cause much higher HMF levels. And that's why there's that difference there. But what's important about what the codex says is the codex says, honey cannot have its essential properties changed. So when the codex is saying 40 milligrams per kilogram is appropriate HMF level to sell honey, they're saying at that level, the essential properties, the benefits of honey have not been changed. So 40 milligrams per kilogram is very clearly the standard for raw honey. Continuing on the Airborne Honey website, the website tells us that the difference imposed standards show us that HMF is not a simple subject and that many anomalies can arise throughout the varied honey world. And key among these is the effect of ambient storage conditions, including the effects of storage in the distribution channel after the processing and packaging and retail containers. HMF value never stops rising. It starts to rise at 20 degrees Celsius, which I believe is about 60 degrees Fahrenheit. And it's gonna continue to rise if your honey is in your pantry, if your honey is at your lawyer's office, wherever your honey is, if it's on a truck, it's gonna rise as long as you're in that 60 degree temperature. So testing honey a year after you purchase it and finding an HMF value of 22 doesn't establish that the honey isn't raw. It very clearly actually shows that the honey probably came out of the hive when it was freshly extracted at that below 10 milligrams per kilogram because through all the course of processing and through a year of storage before testing, it's still tested at only 22. Plannist Council made several statements about filtered honey not being raw honey. There's not a single allegation in this complaint that what was sold by Walmart as raw honey was filtered. There's no allegation there. And if you look at the United States Department of Agriculture's definition for raw honey and the district court hit on this, it says, honey as it exists in the beehive or as obtained by extraction, but not filtered. Raw honey may contain fine particles, pollen grains, air bubbles, comb, propolis, or other defects normally found in suspension. Now in Plannist's complaint, they attached testing reports from the bottles of raw honey as well as a bottle of filtered honey from Walmart. Walmart sells filtered honey. It markets it as filtered honey. It does not sell filtered honey marketed as raw. And when you look at those photos, which the district court did and commented on, it's very clear the filtered honey is a very clean, clear liquid product. And the raw honey had bubbles. It had visible defects. It had all these sorts of things that you can see, these particles, these pollen grains, these air bubbles, pieces of comb, propolis. They're all visible. And if you look at the photos that were attached to the complaint, you can see the raw honey has all of this and the filtered honey didn't. I want to talk briefly about mannose because mannose is relevant to the second honey issue, the organic raw honey. Again, it's an issue of did they plead a standard? There is no standard anywhere for mannose level in raw honey. The codex, which their complaint says provides the standard, does not say anything about mannose levels in honey. The codex talks about moisture content. It talks about the contents of fructose and glucose. It has requirements for the content of sucrose. It has the requirements for the content of water, insoluble solids. It has requirements for food additives, heavy metals, residuals of pesticides. It has requirements for acidity, for diatase, for HMF, and for electrical conductivity. It has no requirement for mannose. The only mention of mannose is in the testing document themselves from True Honey Buzz, which was their Canadian testing company. And it says that mannose levels above 0.02 grams per 100 grams could indicate the presence of foreign sugars or industrial processing unsuitable for honey. And what the district court said about this is there's a lot riding on that could. It's not enough for plaintiffs to plead that the honey might not have been raw. The plaintiffs have to plead that the honey was not raw. And when you have a could, particularly in a situation where you have to plead fraud with particularity and you have to plead violation of the Illinois Consumer Fraud Act with particularity, you can't leave that could out there. Plaintiffs in their briefs try and respond to that could by saying, well, it said it could be added sugars. It could be industrial processing. And the testing report says there was no evidence of added sugars. Ergo, by process of elimination, we have this industrial processing. And I would have two responses to that. The testing report also says mannose can occur naturally in honey based on the geographic location or it can occur naturally in honey based on the botanical source. So it is not something that only exists in honey that has been processed or that has added sugars. My other response to that is they still have the burden of pleading a violation here and they haven't done that. And with that, Your Honor, if there are no further questions, I will sit down and thank you. Thank you, counsel. Anything further, Mr. Norgaard? I'd like to quickly respond. Again, plaintiffs have consistently argued the same thing. If honey cannot be sold directly to a consumer, then it is not raw. Here, the mannose standard is a laboratory standard that the true HoneyBuzz lab is certified by the ISO. Again, the USDA definition, honey freshly extracted but not filtered, that is what plaintiffs argued. Freshly extracted means minimally processed. Not filtered means not heated. And with that, Your Honor, I respectfully request a reversal. Thank you. The case is taken under advisement.